# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SOUTHERN MINERALS GROUP, LLC** ) | |
| ) | |
| **Applicant,** ) | |
| ) | |
| **and** ) | **Case No. _____** |
| ) | |
| **CV INVESTMENTS LLC** ) | |
| ) | |
| **Respondent.** ) | |
| ) | |

## ORDER CONFIRMING ARBITRATION AWARD

Pursuant to its Petition for Order Confirming Arbitration Award ("Petition"), filed June 4, 2020, Applicant Southern Minerals Group, LLC has petitioned this Court for confirmation of the Final Award filed as Exhibit No. 1 to its Petition.  This Court has jurisdiction over this matter under 28 U.S.C. § 1332(a)(1).  Venue attaches under 9 U.S.C. § 9 and 28 U.S.C. § 1391.

Under 9 U.S.C. § 9, the Court must confirm the Final Award "unless the award is vacated, modified, or corrected" under §§ 10 and 11 of the Federal Arbitration Act, 9 U.S.C. §§ 10 and 11.  The Final Award has not been vacated, modified, or corrected, so entry of an Order confirming the Final Award is appropriate.

It is **ORDERED** that Applicant's petition is **GRANTED** and that the May 29, 2020 Final Award is confirmed; and

It is **FURTHER ORDERED** that Final Judgment is entered on the Award.

**SO ORDERED** this _____ day of June 2020.

_____
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SOUTHERN MINERALS GROUP, LLC** ) | |
| **P.O. Box 535** ) | |
| **Silver City, New Mexico  88062** ) | |
| ) | |
| **Applicant,** ) | |
| ) | |
| **and** ) | **Case No. _____** |
| ) | |
| **CV INVESTMENTS LLC** ) | |
| **200 Four Falls Corp. Center, Suite 211** ) | |
| **Conshohocken, Pennsylvania  19428** ) | |
| ) | |
| **Respondent.** ) | |
| ) | |

## PETITION FOR ORDER CONFIRMING ARBITRATION AWARD

Pursuant to 9 U.S.C. §§ 9 and 13 (the Federal Arbitration Act, or "FAA"), Southern Minerals Group, LLC ("SMG"), respectfully petitions this Court for an Order confirming the May 29, 2020 Final Award of the Hon. Mark I. Bernstein (Ret.) ("Arbitrator") in the matter of the arbitration between SMG and CV Investments LLC ("CVI") (collectively with SMG, the "Parties") (copy of the Final Award attached hereto as Exhibit No. 1).  In support of this petition, SMG states the following:

## THE PARTIES

1.      SMG is a limited liability company organized under the laws of the State of Nevada with its principal place of business located near Bayard, New Mexico.  SMG has as its sole member Ebony Iron Pty Ltd., a foreign corporation organized under the laws of the Commonwealth of Australia, with its principal place of business in Sydney, Australia.  SMG operates a magnetite ore

sales operation within the Cobre Mine complex, which is located about three (3) miles northeast of Bayard, New Mexico.  SMG's mailing address is P.O. Box 535 Silver City, New Mexico 88062.

2.      CVI is a Pennsylvania limited liability company with its principal place of business located at 200 Four Falls Corp. Center, Suite 211, Conshohocken, Pennsylvania 19428.  CVI and its related entities are owned, controlled and operated by Ms. Brenda Ann Smith ("Smith").  On August 27, 2019, Smith was arrested by the Federal Bureau of Investigation for allegedly operating a Ponzi scheme and was subsequently charged by the U.S. Attorney for the District of New Jersey with five (5) criminal counts, including four (4) counts of wire fraud and one (1) count of securities fraud.  *See United States v. Smith*, Mag. No. 19-3377 (D.N.J. Aug. 27, 2019).  Contemporaneously with the Department of Justice's action, the U.S. Securities and Exchange Commission ("SEC") filed a civil complaint in the U.S. District Court for the District of New Jersey against Smith and a number of her various corporate entities for violations of securities laws.  *See SEC v. Smith, et al.*, Civ. A. No. 17213 (D.N.J. Aug. 27, 2019).  On September 10, 2019, the District Court Judge issued an order freezing the assets and bank accounts of Smith and the various entities she controlled, including CVI.  Smith remains incarcerated pending the outcome of her criminal proceeding but can, and did, accept service and filings at the correctional facility where she has been held throughout the arbitration and in the other suits lodged against her and various entities she controls.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a)(1) (diversity).  SMG and CVI are citizens of different States, and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

4.      The Award arises under a contract involving interstate commerce and is subject to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*.

5.      Under the FAA, unless the parties have agreed otherwise, venue is proper in the district where the award was made, or in any district proper under the general venue statute. *See*, *e.g.*, *Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 195 (2000). The Parties' Agreement does not include a forum selection clause for proceedings to confirm any arbitration awards thereunder. However, the arbitration took place in Philadelphia, Pennsylvania.

6.      The Eastern District of Pennsylvania is also an appropriate venue because CVI is subject to personal jurisdiction here, and it is the district in which a substantial part of the events or omissions giving rise to the claim occurred. 28 U.S.C. § 1391(b).

## THE SUBJECT ARBITRATION

7.      SMG and CVI were parties to a Magnetite Concentrates Purchase and Sale Agreement ("PSA") dated April 7, 2017, as amended by the First Amendment dated June 6, 2018, whereby CVI "agrees to purchase from Seller up to [] 400,000 tons of such magnetite concentrates for the price of $80.00 per ton." PSA § 2 (attached hereto as Exhibit No. 2); *see also* First Amendment to the PSA ("First Amendment") (attached hereto as Exhibit No. 3).

8.      The PSA provides that "any dispute or controversy arising out of or relating to this agreement or the interpretation thereof, shall be settled by arbitration, held in a mutually acceptable location to the parties, in accordance with the rules, then in effect, of the American Arbitration Association." Ex. 2 at § 10.

9.     SMG filed its Demand for Arbitration ("Demand") with the American Arbitration Association ("AAA") on September 20, 2019.  The AAA docketed SMG's Demand as AAA Case No. 01-19-0002-9998.  SMG's Demand sought an arbitral award against CVI:

(i)     finding CVI materially breached the PSA;

(ii)     finding CVI breached the implied covenant of good faith and fair dealing;

(iii)     finding SMG is entitled to damages, inclusive of interest, for liquidated amounts owned to SMG;

(iv)     finding SMG is entitled to lost profit damages;

(v)     finding SMG is entitled to punitive damages;

(vi)     awarding SMG its attorneys' fees and costs, including but not limited to, all costs of the arbitration;

(vii)     awarding SMG any and all other relief determined appropriate by the Arbitrator.

10.     On December 6, 2019, the AAA announced the appointment of the Hon. Mark I. Bernstein (Ret.) as the Arbitrator.   At SMG's request, and given CVI's circumstances, the Arbitrator determined that a single arbitrator was sufficient for purposes of the arbitration, in accordance with the discretion afford to him under the procedures for Large, Complex Commercial Disputes of the AAA Commercial Arbitration Rules as amended.   American Arbitration Association, Commercial Arbitration Rules & Mediation Procedures ("AAA Rules"), Rule L-2(b) (2013).

11.     On January 31, 2020, the Arbitrator established a schedule for the proceeding and determined that the proceeding would be adjudicated through written filings only.

12.     In accordance with the Arbitrator's January 31 order, SMG propounded a limited set of Requests for Admissions, Interrogatories, and Requests for Production of Documents to CVI on February 20, 2020.  SMG filed its Affirmative Case on March 20, 2020 and its Rebuttal on April 20, 2020.  CVI made no responsive pleadings, nor did CVI respond to discovery requests despite being afforded additional time by the Arbitrator to do so.  By order dated May 13, 2020, the Arbitrator closed the record in the case.

13.     The Arbitrator issued his Final Award on May 29, 2020.  *See* Exhibit No. 1. Therein, the Arbitrator found that "[a]ll required due process was afforded to both sides through the impartial application of the Arbitration Rules agreed to by the parties in their agreement."  *Id*. at 4.  The Arbitrator further found that SMG is entitled to relief in its favor.  Specifically, the arbitrator found that: (i) CVI materially breached the PSA; (ii) CVI breached the covenant of good faith and fair dealing; (iii) CVI's bad faith acts warranted punitive damages under New Mexico law; (iv) CVI's bad faith acts warranted the application of the maximum interest rate available under New Mexico law; and (v) CVI must bear the cost of the arbitration.  *Id*. at 19-22.  The Arbitrator awarded damages and costs as follows: (i) $4,215,000 in liquidated damages as of March 1, 2020; (ii) $14,090,599 in lost profits; (iii) $3,600,000 in punitive damages; (iv) $23,660 in arbitration costs; (v) prejudgment and post-judgment interest of 15% is applicable to the liquidated damages; and (vi) post-judgment interest of 15% is applicable to all other damages and costs.  The Arbitrator declined to award attorneys' fees as requested by SMG.

14.     The Final Award is a final award subject to confirmation in this Court.  *Id*. at 23.

## **CONFIRMATION OF THE AWARD**

15.     The Court should confirm the Final Award under Section 9 of the FAA, 9 U.S.C. §

9, for the following reasons.

16.     Under Section 9 of the FAA, application for confirmation of an award may be made

to a court in which jurisdiction exists at any time within one year after the award is made.  9 U.S.C.

§ 9.  Such an application must be granted "unless the award is vacated, modified, or corrected as

prescribed in sections 10 and 11 of [9 U.S.C.]."  *Id.*

17.     The Parties have agreed to the application of the AAA Rules under the PSA.  *See*

Ex. 1 at § 10.  Under AAA Rule R-52(c), "[p]arties to an arbitration under these rules shall be

deemed to have consented that judgment upon the arbitration award may be entered in any federal

or state court having jurisdiction thereof."

18.     Since the PSA does not include a forum selection clause, "application may be made

to the United States court in and for the district within which such award was made."  9 U.S.C. §

9.  The Final Award was made in Philadelphia, Pennsylvania.

19.     This Petition is made well within the one-year deadline, as the Final Award was

made on May 29, 2020.  Furthermore, no action has been taken to vacate, modify or correct the

Final Award under Sections 10 or 11 of the FAA.  9 U.S.C. §§ 10, 11.  Thus, the Final Award is

ripe for confirmation by this Court.

20.     Section 13 of the FAA directs that a judgment be entered on a confirmed award.  9

U.S.C. § 13.  Such a judgment "shall be docketed as if it was rendered in an action."  *Id.*

21.     SMG submits contemporaneously herewith a proposed Order Confirming

Arbitration Award and entering judgment thereon.

WHEREFORE, SMG respectfully petitions this Court to enter an order confirming the

Arbitrator's Final Award of May 29, 2020, and enter judgment thereon.

**CLARK HILL PLC**

Dated:  June 5, 2020                          _____ */s/* Lisa Carney Eldridge _____
                                                         Lisa Carney Eldridge, Esquire (PA ID #62794)
                                                         Two Commerce Square
                                                         2001 Market Street, Suite 2620
                                                         Philadelphia, PA  19103
                                                         Phone:  (215) 640-8500
                                                         Fax:  (215) 640-8501
                                                         leldridge@clarkhill.com

                                                         Of Counsel:

Dated:  June 5, 2020                          _____ */s/* Daniel M. Jaffe _____
                                                         Daniel M. Jaffe, Esquire
                                                         A Rebecca Williams, Esquire
                                                         SLOVER & LOFTUS LLP
                                                         1224 17th St., N.W.
                                                         Washington, DC  20036
                                                         202-347-7170 _____
                                                         dmj@sloverandloftus.com
                                                         * *Pro Hac Vice applications shall be submitted*

                                                         *Attorneys* for *Southern Minerals Group, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that this 5th day of June 2020, I have caused true and correct copies of

the foregoing **Petition to Confirm Arbitration Award** to be served upon Respondent CV

Investments LLC by U.S.P.S. Overnight Mail:

CV Investments LLC
200 Four Falls Corp. Center, Suite 211
Conshohocken, PA  19428

A courtesy copy of the foregoing petition to be served via United States Postal Service,
overnight mail, upon non-party Brenda A Smith, designated as defendant CVI's "Authorized
Representative" in the underlying Arbitration as follows:

Brenda A. Smith
Permanent ID 2019-339640
CCIS# 07-571432
U.S. Marshalls Number 72832-050
Essex County Correctional Facility
354 Doremus Avenue
Newark, NJ 07105

**CLARK HILL PLC**

Dated:  June 5, 2020                        */s/* Lisa Carney Eldridge
                                            Lisa Carney Eldridge, Esquire (PA ID #62794)
                                            Two Commerce Square
                                            2001 Market Street, Suite 2620
                                            Philadelphia, PA  19103
                                            Phone:  (215) 640-8500
                                            Fax:  (215) 640-8501
                                            leldridge@clarkhill.com

                                            *Attorneys for Southern Minerals Group, LLC*

# EXHIBIT 1

**AMERICAN ARBITRATION ASSOCIATION**

**Commercial Arbitration under AAA Commercial Rules and Mediation Procedures
Amended and effective October 1, 2013**

---

AAA Case 01-19-0002-9998

Southern Minerals Group, LLC

Represented by Daniel Jaffe, Esq. and A. Rebecca Williams of Slover & Loftus LLP

      v.

CV Investments, LLC

ex parte

---

## FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement dated April 7, 2017 and entered into between Claimant, and Respondent, and having been duly sworn, and having duly reviewed the proofs and allegations of Southern Minerals Group, LLC, and CV Investments LLC having failed to submit proofs and allegations after due notice by mail in accordance with the Commercial arbitration Rules of the American Arbitration Association, hereby, AWARD as follows:

## Decision and Opinion

An award is entered in favor of claimant Southern Minerals Group, LLC and against respondent CV Investments LLC in the amounts set forth below.

## Procedure

Pursuant to the agreement between the parties dated April 7, 2017 as amended June 6, 2018,  claimant filed this action on September 20, 2019. Apparently, respondent's principal had been indicted by Federal Authorities and at the time of filing its primary representative was incarcerated in Federal custody.

On December 4, 2019, Hon. Mark I. Bernstein (Ret.) was selected to be the AAA arbitrator for this matter under the Large Complex procedures of the Commercial Arbitration Rules as amended.    Given the claim amount, the Procedures for Large, Complex Commercial Disputes specifies the number of arbitrators to be three. The parties' arbitration provision was silent as to the number of arbitrators. Pursuant to the applicable rules, expecting to be required to pay all costs of arbitration, petitioner requested that the number of arbitrators be reduced to a single arbitrator. According to the rules the first arbitrator determines whether to proceed with a single arbitrator or if three shall be appointed.  Since Respondent's representative was only able to communicate via US Mail, it was directed that all communication was to be made in writing.

On, November 11, 2019, Brenda Smith, respondent's representative, submitted a handwritten letter request an indeterminate stay alleging an inability to respond because company records had been seized and had been retained by Federal authorities.  Respondent offered no suggestion as to how or when this situation would change, such that the matter could resume.  Most significantly, as claimant stated in their response there was no suggestion that Smith lacked sufficient knowledge to participate.  Claimant further claimed that had this matter been amenable to court filing, a default judgment, unavailable in AAA arbitration,

would have been entered and claimant would earlier have had a judgment to collect upon if respondent did not participate.

Respondent requested a hearing by three arbitrators.  Claimant responded that no right existed and since claimant would be paying for all costs of arbitration requested the matter be decided by one arbitrator  in accord with the AAA rules. By Order dated December 14, the arbitrator ruled that one arbitrator would decide the matter and that the preliminary hearing would be held by written submission.

On January 8, 2020, the arbitrator received Claimant's written preliminary hearing statement and respondent's written letter which did not contain any substantive preliminary hearing statement and merely asked for a 6-month extension, but offered no explanation as to how anything would change 6 months hence.  On January 9 claimant responded in writing to the requested extension.

By Order dated January 31, 2020 the arbitrator ruled that this matter would proceed and set a schedule for discovery and hearing through written submissions.

By submission dated March 20, 2020, as required by the January 8, 2020 Order, claimant submitted its affirmative case memorandum containing procedural background, statement of material facts, and memo of law.  Attached thereto were the verified statements of John Peter and Clovis Hooper and a statement of damages.

Claimant also advised that by correspondence dated February 20, 2020 they had submitted Requests for Admissions, Interrogatories, and Requests for Production of Documents and had received no substantive responses but had received a handwritten letter dated March 20, 2020 which was attached.

Respondent's letter stated that although she was unable to retain papers but could have access to a thumb drive.

Accordingly, On April 8, the arbitrator Ordered a thumb drive be provided to respondent and that thereafter, respondent would have 10 days to respond to Claimants discovery requests, or the Request for Admissions would be deemed admitted.

On April 20 Claimant Southern Mineral Group, submitted a memorandum entitled "Rebuttal of Claimant" in which it pointed out that no substantive response whatever had been received from respondent as to the claim and renewed its request for damages.

Claimant sent a thumb drive to respondent on April 27. Since there has been no response by respondent, the Requests for Admissions are deemed admitted.

All required due process was afforded to both sides through the impartial application of the Arbitration Rules agreed to by the parties in their agreement.  All reasonable accommodation was made for the parties.  No in person or even telephonic conferences were required and all submissions could be made in writing.  Handwritten submissions were accepted, considered, and evaluated.  No substantive responses were ever received from respondent.

The record was properly closed on May 13, 2020.

<u>Factual Findings</u>

On April 7, 2017 Mr. Clovis Hooper, President of Claimant Southern Minerals Group, LLC (hereinafter SMG) negotiated a Magnetite Concentrates Purchase and Sale Agreement ("PSA") between SMG and Respondent CV Investments LLC ("CVI")

This agreement was subsequently amended on June 6, 2018. Under that agreement, CVI committed to purchasing 400,000 tons of magnetite from SMG at a price of $80.00 per ton at a rate of 4,000 per month beginning in June 2017. This agreement was amended in mid-2018. However, beginning in October 31, 2018 CVI began a pattern of failure of performance followed by representations and promises which were never fulfilled.  (see verified statements of Mr. John Peters and Clovis Hooper) CVI has made no payments to SMG since October 2018 (Request for Admission No. 1).  CVI breached the PSA. (Request for Admission No. 3). CVI's Smith was arrested on August 27, 2019.  As of March 1, 2020, SMG's liquidated damages are in the amount of $4,215,000, exclusive of interest. (Request for Admission No. 2).

Mr.  John Peters is the Managing Director of Strategic Minerals PLC, parent company of Southern Minerals Group, LLC ("SMG"). Together with SMG's President, Mr. Clovis Hooper, Mr. Peters negotiated with CVI the Magnetite Concentrates Purchase and Sale Agreement ("PSA") referred to above which was executed on April 7, 2017.  This agreement was amended on June 6, 2018. CVI's sole representative was Ms. Brenda Smith ("Smith").

SMG has exclusive access to a magnetite stockpile and operates a magnetite sales operation from the Cobre Mine in New Mexico. SMG's access rights to the magnetite is limited to 800,000 tons. Pursuant to the PSA contract CVI was obligated to purchase 400,000 tons of concentrates with minimum monthly purchases of 4,000 tons.  SMG committed access to those tons exclusively to CVI. This commitment by SMG amounted to 50% of its total access to magnetite. Throughout the term of the agreement SMG was able to provide the full 400,000

tons to CVI in accordance with the PSA's monthly purchase schedule. SMG's staffing and costs increased to accommodate the commitment to CVI. CVI took only a total of 38,414 tons of magnetite concentrate from the initiation of the PSA in June 2017. Most of this volume was taken in the first few months. All but one of the shipments was moved, at CVI's request, to property in New Mexico.

CVI defaulted on its required payments. By the end of 2017, CVI was $642,000 in arrears. All CVI shipments were made by truck as required under the PSA. However, when CVI had no named destination for the delivery of the magnetite concentrates CVI requested storage in New Mexico. CVI made 19 payments to SMG for magnetite between June 19, 2017 and October 31, 2018. At various points in 2018, CVI paid some of its outstanding balance but $371,000 was owing when the Parties negotiated the First Amendment in June 2018. SMG generously reduced the outstanding amount owed by over $215,000, conditioned on CVI's payment of the reduced balance. That amended agreement required CVI to make quarterly deposits in lieu of taking the 4,000-ton minimum.

Despite assurances, CVI repeatedly failed to make these required payments. CVI's regular monthly obligations were to resume beginning March 1, 2019. The last CVI payment to SMG was in October 2018. Despite ceasing to make payments, CVI's Smith repeatedly assured SMG that CVI was about to sell a bond and receive a major infusion of cash. Smith reassured that SMG would be paid what was owed when that sale closed. CVI repeatedly claimed that the closing was delayed by forces outside its control. Smith continued her reassurances until August 2019 when she was arrested for allegedly engaging in a Ponzi scheme and CVI assets were seized. SMG's obligations under the PSA and CVI's excuses, delays and

diversions precluded SMG from pursuing other potential purchasers of the magnetite concentrate.

A detailed spreadsheet of SMG's transactions with CVI under the PSA was attached as Exhibit No. 1 to the statement of Mr. Hooper.

Under the amended agreement, CVI's monthly obligations restarted March 1, 2019. CVI failed to make any required payments, these required payments equaled $3,840,000 for the 12 months between March 2019 and February 2020. Consequently, as of March 2020, CVI's liquidated damages owed to SMG equaled $4,215,000, exclusive of interest. In addition to the liquidated damages CVI's breach of the PSA has resulted in SMG incurring direct and consequential damages. CVI's PSA represented a commitment to purchasing half of SMG's magnetite inventory. The volume committed to, and the expected revenue from, CVI under the PSA far exceeds the volume purchased by, and revenue earned from, all other SMG customers combined. Thus, in 40 months, SMG expected to realize significant profits associated with CVI exclusive access to their magnetite rights.

To determine lost profits, the damages calculation has three complementary analyses. The first analysis assumes that CVI performed as required under the PSA. SMG expected to realize over $45.6 million in total revenues during the approximately 8 years of the PSA (2019 – 2027). Of that $45.6 million, SMG expected that CVI purchases would account for $28.9 million, or 63% of all revenues. During that same period, SMG has known and estimated unit costs. SMG's calculation of $21.1 million in expenses is a conservative analysis representing the expenses that SMG might have incurred. Thus, SMG expected to

earn $24.5 million of net profit over the balance of the PSA. To determine the net present value ("NPV") of the expected profit, SMG applied a discount rate of 2%. The NPV calculation yields a current value of reasonably expected profits of **$22.7** million.

SMG's second analysis accurately assumes that CVI made no further purchases from January 1, 2019 thru the remainder of the PSA. In this analysis, SMG's expected profits drop dramatically because SMG will likely have to extend its operating period by 20 years to sell the same volume of magnetite concentrate, and revenues are likewise impacted because certain customers pay less per ton than CVI. Critically, the extended period means SMG will incur additional recurring and fixed expenses with fewer sales. SMG's calculation is again, very conservative. The second analysis shows that over the 20-year period, SMG would earn $41.2 million in revenue  and  incur approximately $36.0 million in expenses over the same period. The second analysis shows that SMG expected to earn $5.2 million net profit over the 20-year period. Consistent with the first analysis, SMG applied a discount rate of 2% to determine the NPV of the expected profit. The NPV calculation yields a current value of $**4.4** million.

SMG's third analysis calculates the difference between these conservative analyses. The third analysis shows that the difference in the NPV of the expected profits between the first and second analysis is $18.3 million. Thus, SMG submits that its total damages attributable to CVI's breach of the PSA is $18.3 million. However, as $4,215,000 of the damages is already a known and liquidated value, SMG calculated it lost  $14,090,599 in profit damages and $4,215,000 million in

liquidated damages. The arbitrator finds this analysis to be reasonable, conservative, and accurate.

## Detailed Findings of Bad Faith

CV Investments LLC ("CVI") is owned, controlled, and operated by Ms. Brenda Ann Smith. Ms. Smith stands charged by the U.S. Attorney for the District of New Jersey with five (5) criminal counts, including four (4) counts of wire fraud and one (1) count of securities fraud. On the same day as criminal charges were lodged, the U.S. Securities and Exchange Commission ("SEC") filed a civil complaint in the U.S. District Court for the District of New Jersey against Smith and her various corporate entities for violations of securities laws. On September 10, 2019, the assets and bank accounts of several the named defendants were frozen.

SMG has the exclusive right to access approximately 800,000 tons of magnetite concentrates. Under the PSA, CVI was obligated to purchase 400,000 tons of such magnetite concentrates for the price of $80.00 per ton with a required minimum of 4,000 tons per month beginning June 1, 2017. In return, SMG was required to "ensure that it does not undertake any activities that impact the Purchases [sic] rights to the magnetite concentrates." Given commitments to other customers and local regulations, SMG was prohibited from providing more than 5,500 tons of magnetite concentrates per month to CVI. SMG requested, and CVI provided, "a deposit of $10,000" to SMG. Likewise, SMG requested, and CVI provided, a "standby letter of credit in the amount of $250,000.00 issued by a major US banking institution" or a cash deposit in the same amount to be held "in solicitor's trust."

CVI's monthly purchases of magnetite ore began June 1, 2017, and shipments of the material began on or around July 1, 2017. Between June 2017 and October 30, 2017, CVI met its contractual obligations under the PSA by purchasing the required minimum of 4,000 tons of magnetite ore each month and promptly payed for those purchases. Beginning with the SMG invoice dated October 31, 2017, CVI's payments fell into arrears.  In January 2018, CVI paid its outstanding balance of $642,572.80. Immediately following its January 2018 payment, CVI again fell into arrears, and by March 2018, CVI owed SMG $521,404. In March 2018, CVI  notified SMG that it was "unable to take delivery of the minimum volume" of the magnetite ore due to delays in "obtaining environmental approvals." To continue their contractual relationship the parties entered the First Amendment dated June 6, 2018. The First Amendment suspended CVI's obligation to purchase a minimum of 4,000 tons per month "for the period March 1, 2018 through May 31, 2018; provided, however, that such waiver is contingent on [CVI] meeting its obligations as otherwise required in the PSA and this Amendment." The referenced obligations included CVI paying the amount then in arrears, $371,404, according to a detailed payment schedule. If CVI failed to meet that payment schedule it would "forgo[] any right to take the remaining balance of the Prepaid Quantity for the applicable calendar quarter . . . ." CVI agreed to "resume its obligation to undertake to purchase a minimum of 4,000 tons per month at $80 per ton," beginning March 1, 2019. CVI failed to make the payments required.

On June 15, 2018, SMG invoiced CVI for the first quarterly prepayment of $375,000 in accordance with Section 4 of the First Amendment. Payment was due June 25, 2018.  On July 10, 2018, CVI paid that invoice.  On September 1, 2018,

SMG invoiced CVI for the second quarterly Prepayment due September 11, 2018. CVI failed to make that payment.

On September 13, 2018, SMG provided notice to CVI that it must rectify its past due amounts of over $600,000 otherwise SMG would consider CVI in default,

On Monday, October 8, 2018, SMG again wrote to CVI regarding the outstanding balance of $371,404 and offered to  reduce the outstanding balance by $217,431.20 to reflect the 2,717.89 tons of the 4,000 ton minimum that CVI did not take physical delivery of in February 2018.  This offer was contingent upon CVI paying the remaining balance in three installments  and  CVI release to the $250,000 security deposit CVI had previously made. On October 11, 2018, CVI made a counteroffer that accepted the structure of SMG's proposal but extended the time for the  installment payments.   SMG agreed to CVI's counteroffer. Nonetheless, CVI failed to make the initial installment payment on the agreed upon due date of October 22, 2018 but did make two payments totaling $53,972.80 on October 31, 2018.  CVI subsequently missed the two remaining $50,000 installment payments due November 5 and November 19, 2018. Likewise, CVI never paid  the outstanding balance by December 11, 2018 as required.

CVI has not made any further payments to SMG. On December 29, 2018, SMG sought further payment, requesting that CVI pay its outstanding balance of $475,000 before the end of 2018.

On December 29, 2018, CVI offered to pay the $475,000 in the first week of January 2019. SMG suggested CVI agree to release to SMG $100,000 from CVI's security deposit;  pay the remaining $375,000 owed to SMG in the first week of January 2019; and  replenish the amount of the security deposit released to SMG.

On December 30, 2018, CVI agreed to SMG's proposal and consented to the $100,000 transfer from the security deposit to SMG. CVI never paid the remaining $375,000 due to SMG, nor did it ever replenish the deposit. Instead, CVI began a series stalling tactics.

January:

- On January 4, 2019, CVI's Smith stated that SMG should have the funds the "following week."
- On January 9, 2019, CVI's Smith stated that the funding should be approved "[b]y end of day tomorrow"
- On January 17, 2019, CVI's Smith claimed "3 deals to close today or tomorrow. My funds from deal payout within one week."
- On January 17, 2019, CVI's Smith claimed she has the "financial instrument in hand to fund."
- On January 22, 2019, Smith claimed that closing would occur the following day (January 23, 2019) and informed SMG's Peters that she sent him "a confidential copy" of the "actual financial instrument,". Nonetheless, no payment was forthcoming.

February:

- On February 8, 2019, Smith said that she "was just told my wire leaves at 9 am tomorrow London time. Of course, I have to wait for banks to open here. I fully expect to be able to send $475,000 tomorrow. I will be happy to discuss future plans early next week."
- Yet again, on February 16, 2019, CVI's Smith claimed to "have taken control of the entire transaction and spent the day working out

details. I now have direct contact with the buyer of my bond and his banker. . . . I fully expect a wire on Monday and am not relying on anyone in between." CVI's Smith further assured SMG of CVI's ability to secure funding for payment, stating "BTW [by the way], this is real, I will close" and blaming the delay on a number of things, including the time difference and that the "buyer trader was delayed in [the] subway."

- On February 27, 2019, CVI's Smith claimed that an "[i]nstrument [was] delivered last night at 22:00 by my trade desk."

March:

- Beginning March 1, 2019, SMG resumed invoicing CVI for its monthly minimum purchases of 4,000 tons of magnetite concentrates, pursuant to Section 4(b)(ii) of the parties' First Amendment.  Yet on March 1, 2019 Smith claimed that the "buyer bank downloaded the message / instrument today. Waiting for buyer account to get credit for instrument and then funds are released. Unfortunately, I am told that could take up to 5 days from transmission which was Tuesday."

- On March 8, 2019, SMG's Peters notified CVI's Smith that he needed to update his Board of Directors on the "expected timing of payment and plans to address the existing contract . . . ." On March 9, 2019, CVI's Smith responded, "still not closed & no production,"

- On March 13, 2019, SMG's Peters again inquired as to the timing of payment, to which CVI's Smith again responded with the claim that she was "[t]rying to close this week."

- On March 29, 2019, SMG requested an update from CVI's Smith by close of business regarding CVI's overdue payments, including a $50,000 wire transfer that CVI supposedly sent to SMG the prior week.

- On March 30, 2019, CVI's Smith claimed her banker had moved their scheduled meeting, and she would have to confirm with him when her transactions would be final and would check on the "outgoing wire."

April

- On April 3, 2019, CVI's Smith again claimed her "banker delayed the meeting until April 8." And that she had "pending transactions that will close this month," but "do[es] not have substantial cash on hand until closing."

- On April 11, 2019, CVI's Smith stated that she did not "have the funds" to pay, but that the "funds are closing on Tuesday April 16."

May:

- On May 15, 2019, Smith, provided a purportedly "internally generated balance sheet" for CVI showing over $59 million in assets.

- On May 21, 2019, CVI's Smith responded to an email from SMG's Peters requesting an update, again claiming that she "expect[ed] to receive funds by close of business" the next day. on

- May 23, 2019, SMG's Peters again asked CVI's Smith via text message if the bonds had settled. CVI's Smith claimed she "should have funds tomorrow." On that same day SMG's Peters asked CVI's Smith to

formally agree to undertake certain actions to avoid legal proceedings, as follows: I was able to get my UK Directors and Alan this morning and I have got them to agree that, provided, on behalf of CV Investments, you undertake to pay SMG, within two weeks, the $375,000 December payment and top up the existing deposit with SMG by $3,690,000 they will hold all actions for those two weeks. . . . . Please provide, on behalf of CV Investments, agreement to these arrangements." CVI's Smith responded "Agreed. Thank you very much. Brenda.".

- When SMG attempted to memorialize the parties' new agreement in a Second Amendment to the PSA, CVI did not execute the Second Amendment, despite having already agreed to the terms. On May 25, 2019, SMG's Peters again asked CVI's Smith via text message if CVI had secured its funds yet.  Responding that same day, CVI's Smith again put off SMG's Peters, claiming it would be "first thing Tuesday am [morning]"

- On May 29, 2019 , after the date CVI's Smith claimed the funds would be available, SMG's Peters asked CVI's Smith via text message: "has Merrill released the funds" and, if not, "what are your expectations." CVI's Smith only responded with "tomorrow."

- On May 30, 2019, SMG's Peters asked CVI's Smith to "please update the position with CVI." CVI's Smith responded that same day, stating "Not yet. Still working hard on it."

June:

- On June 3, 2019, CVI's Smith emailed SMG's Peters that the funds would be available in two days, citing issues with the bankers.

- On June 6, 2019, CVI's Smith stated that the buyer "changed delivery," and it would "[p]robably" take an additional day. Later that day, CVI's Smith stated she had "tried to be direct [and] honest" and was "doing everything possible to fund by Friday".

- SMG's Peters then asked CVI's Smith if CVI could at least provide SMG with $100,000 on Friday, June 7, 2019, along with supporting paperwork for the bond funds that Peters could show to SMG's Board of Directors. Id.  CVI's Smith responded that it would provide SMG with the requested $100,000 and paperwork by Friday June 7, 2019 but then failed to do so.

- On June 7, 2019, the supposed bond sale did not settle despite CVI's Smith claiming that the bankers were "working on it."

- On June 8, 2019, CVI's Smith claimed she was "[j]ust off [the] phone with [the] Buyer" and that they were working it, but there would be "[n]o wire today but it will go out Monday."

- On June 11, 2019, CVI's Smith again suggested that funds "may" be available "tomorrow" if the bankers can move the process along.

- On June 14, 2019, Peters sent  Smith a text message requesting a telephone conference. Smith claimed she was sick. Later that day, when asked  for an update on the bonds, Smith responded "[w]orking with bankers now".

- On June 20, 2019, Peters again asked  Smith for an update, to which Smith responded "[t]rying to receive one transfer today. Still waiting on email from banker."

- On June 23, 2019, Smith claimed she was "[w]aiting on confirmation of transfer."

- On June 24, 2019 Smith did not respond to Peters request for status.

- On June 26, 2019, Peters asked  Smith if CVI was "any firmer on timing of cash payment to SMG," and was told "[e]xpect [F]riday".

- On June 28, 2019, the new expected payment date, CVI failed to make payment.

- On June 30, 2019, CVI's Smith said: "I can make that payment based on drawing down the bond," .

July:

- On a July 13, 2019 telephone conference,  Peters and Smith discussed an option, whereby CVI would borrow against a supposed LOC for ninety (90) days to pay SMG while CVI awaited its supposed bond settlement.

- On July 14, 2019,  Peters asked CVI's Smith whether CVI had considered the option, but CVI's Smith did not answer the question and instead suggested she was "trying."

- On July 14, 2019,  Smith purported to send SMG details of the bond issuance.

- On July 18, 2019, alarmed by reports that FINRA had cited and subsequently barred Smith from "associating with any FINRA

member" for rules violations, Peters text messaged  Smith asking about the matter. CVI's Smith claimed the FINRA violations were not related to her trading and said she could "explain on [the] phone."

- On July 24, 2019, Smith stated that she should have confirmation that the bond had settled that day.

- On July 26, 2019,  Smith claimed her banker "says I will have bank statement showing 100 mm tomorrow & it will be available to disburse next Wednesday" (July 31, 2019).

-  On July 27, 2019, Smith said:  "I do not have statement yet. I give up. Sue me" .  She later stated she was still waiting for an update from the banker, but funds should come through "this week for sure."

August:

- Throughout the month of August 2019, the  "deal" was supposedly imminent, but then CVI ceased all communication.

- On August 9, 2019, SMG's Peters emailed  Smith asking why she had "stopped communicating." Smith responded, claiming that her "banker now says I should have some funds on Tuesday [August 13, 2019]. He says [C]credit Suisse is wrapping up monetization. Can we wait until Tuesday?"

- On August 14, 2019, Smith claimed: "I talked to my banker this morning and he said the 'monetizer' has accepted the instrument, Credit Suisse has completed their process and agreed to start disbursements. He says funding is imminent." Despite these claims, no funds were ever disbursed to SMG.

- On August 16, 2019 Smith said she was waiting "for my banker to schedule." And then said: "[t]turning phone off."

- Throughout the remainder of August Peters and Smith exchanged several emails wherein Smith avoided a personal meeting or telephone conference and suggested instead "sue me or something." And then suggested that her "usa [sic] banker says I am still getting [the] advance this week but I don't have it yet."

- On August 26, 2019, Smith assured that she would sign a note for $4.065 million .

- On August 27, 2019, Smith was arrested by the FBI on charges that she had been running a Ponzi scheme. The federal indictment lodged against Smith and several of her corporate entities states that the behavior with CVI was done to many different victims.


### Conclusions:

The arbitrator draws no conclusion from the unproven allegations of the indictment. A defendant has a presumption of innocence and no conclusion can be drawn from the allegations. It is clear however, that CVI cannot now and will not in the future fulfill the requirements of the PSA.

From the submissions that form the record in this claim including the uncontested Demand for Arbitration and the exhibits attached thereto, affirmed in the statements of Mr. Peters and Hooper, the additional information provided by those statements, the unanswered and therefore admitted Request for Admissions, it is clear that CVI entered into a binding agreement, subsequently

amended, made substantial reassurances and additional promises over an eight month period and materially breached that contract, the  PSA.  CVI made no payments to SMG under the PSA after October 2018.  Agreed upon purchases were not made.  Neither was the balance due of $375,000 ever paid. Under the PSA and CVI's written assurances of payment, the amount of $4,215,000 is owing as of March 1, 2020. SMG is entitled to liquidated damages in the amount of $4,215,000.  SMG is also entitled to lost profits in the amount of as set forth in exhibit 2 of Mr. Hooper's verified statement.

That verified statement explained in detail the methodology used to calculate loss.  Mr. Hooper reasonably calculated the net profits expected if CVI had fulfilled its agreement over the 8 years remaining to the PSA.   This lost profit was 22.7  Million dollars .  He then calculated the profits expected from the sale of the same quantity of magnetite over a longer period given the failure of CVI to fulfill its agreement. This would yield 5.2 million in profits, a mitigating factor in the damages calculation.   Subtracting the profits reasonably expected over the longer period due to the failure from the expected profit if the contract had been fulfilled resulted in a total profit loss of  $14,090,599.   Within the amount of this loss is the lost profit as of March 1, 2020 which had already been calculated and awarded as liquidated damages.  Subtracting the award for liquidated damages yields a net future loss of profit at $14,090,599.   In all these calculations the profit analysis had been reduced by a reasonable 2% discount rate. Mr. Hooper conservatively estimated the damages which "arise naturally and necessarily" from the breach in accordance with New Mexico Law,

## Law

The agreement requires that the law of New Mexico apply.  Under New Mexico law the claim has been timely presented.  NMSA 1978 §37-1-3(A) provides for a 6-year statute of limitations for contractual claims.  Damages recoverable and proven herein are the damages which "arise naturally and necessarily" from the breach in accordance with New Mexico Law (Sunnyland Farms, Inc. v Cent. N.M. Elec. Co-op Inc., 301 P. 3rd 387 (N.M.2013).

Under New Mexico Law, punitive Damages are recoverable "for breach of contract whenever defendant's conduct was malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights." The defendant repeatedly made false reassurances about imminent performance, and intentionally misled the plaintiff about its intention and ability to perform.   As detailed above, there can be no question that the continual bogus reassurances and purportedly detailed explanations of the imminent receipt of funds to pay the debt owed, were both malicious and "committed recklessly with a wanton disregard for the plaintiff's rights".  Accordingly, punitive damages are warranted and awarded.

The purpose of punitive damages is to punish the defendant and deter others from similar conduct.  The compensatory award entered herein, if collected, shall make plaintiff whole and shall allow plaintiff to recover profits reasonably but conservatively expected under the contract.  Accordingly, to punish this bad faith behavior and to deter others from similar conduct, in addition to the compensatory award and in accord with New Mexico law, the arbitrator awards punitive damages in the amount of $3,600,000.

New Mexico law permits pre and post-judgment interest (NMSA 1978 §2004.  Accordingly, pre-judgment interest on the liquidated damages awards of $4,215,000 is ordered.  Post-Judgment interest is awarded from the date of entry of judgment.   Since judgment is awarded based on the bad faith and  intentional acts of defendant, interest is by law to be computed in the amount of 15% per annum.

Since SMG has been forced to bear all costs of this arbitration, and CVI has not participated in any meaningful way other than to request extensions, costs are awarded to plaintiff.  New Mexico law does not permit the award of attorney fees except where the behavior of the defendant occurs "before the court or in direct defiance of the court's authority"(see state ex rel. N.M. State Highway and Transp. Dep't v. Baca 896 P.2d 1148 (1995), there is no authority to award attorney fees for private contractual claims even where defendant has acted in bad faith and even where the intent of the bad faith actions were intended to defer and dissuade resort to  legal (or AAA arbitration) action.

<u>Judgement and Decision</u>

<u>The arbitrator awards Claimant SMG against respondent CVI the following amounts:</u>

<u>Liquidated damages:</u>  $4,215,000

<u>Lost Profit:</u>  $14,090,599

<u>Punitive Damages:</u> $3,600,000

<u>Prejudgment Interest at 15% on liquidated damages of $4,215,000</u>

<u>Post judgment Interest at 15%</u>

Costs: The Administrative fees and expenses of the AAA totaling $12,200.00 are to be borne $12,200.00 by CV Investments, LLC. The Compensation and expenses of Arbitrator totaling $11,460.00 are to be borne $11,460.00 by CV Investments, LLC. Therefore, CV Investments, LLC has to pay Southern Minerals Group, LLC, an amount of $23,660.00.

This Final Award is in full and complete settlement and satisfaction of any and all claims that were submitted to the jurisdiction of this Arbitrator in connection with the present dispute.  All claims, arguments or issues not specifically addressed in this Final Award and not reserved for further disposition, are rejected and denied with prejudice.

By the Arbitrator:

Dated:  May 29, 2020

_____

Hon. Mark I. Bernstein (Ret)

Sole Arbitrator

I, Hon. Mark I. Bernstein (Ret), do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed the foregoing instrument, which is the Decision and Final Award in this Arbitration.

_____

Hon. Mark I. Bernstein (Ret) Sole Arbitrator

# EXHIBIT 2

**Magnetite Concentrates**
**Purchase and Sale Agreement**

Southern Minerals Group, LLC of P. O. Box 535 Silver City, NM 88062 as "**Seller**," and
CV Investments LLC 200
Four Falls Corp. Ctr. Suite 211, Conshohocken, PA 19428 and affiliates as "**Purchaser**," agree as
follows:

1. Seller has the exclusive right to access approximately 800,000 tons of magnetite
concentrates (this is an estimate of the size and should not be relied upon as a definition of
resource), a treated by-product of copper mining and milling operations conducted at the Mine
site formerly operated by Freeport-McMoRan located in Grant County, New Mexico, and has in
place contracts or purchase orders to sell approximately one-half of that inventory to other
purchasers. The Seller will ensure that it does not undertake any activities that impact on the
Purchases rights to the magnetite concentrates. Should, for any reason, the Sellers right to access
this material be terminated, then on the day that access is terminated this Agreement will
terminate, without further recourse to Purchaser and Seller other than amounts already
outstanding or breaches of Agreement occurring up to that date.

2. Seller hereby agrees to sell to Purchaser and Purchaser hereby agrees to purchase from
Seller up to 400,000 tons of such magnetite concentrates for the price of $80.00 per ton.
These prices include Seller loading the concentrates into Purchasers' trucks with Seller's
equipment and equipment operators, and Seller shall bear all costs associated with such loading
operations. The Purchaser undertakes to purchase a minimum of 4,000 tons per month from
~~commencement of this Agreement~~; June 1, 2017. _PJB CH_

3. Purchaser shall provide the trucks and truck operators to haul the concentrates and
shall bear all costs associated with such hauling operations. The Purchaser shall ensure that
representatives of the Purchaser (including truck drivers) shall conduct its activities in a good
and professional manner and in accordance with the reasonable directions (if any) given to it by
the Seller from time to time.

4. Seller shall maintain accurate certified weighing facilities and will weigh the
Purchaser's trucks on entrance and exit, unloaded and loaded, and provide the net weights of
each load to Purchaser as each loaded truck exits the site, and provide appropriate Material
Safety Data Sheets. The Seller shall not be liable for loss or damage suffered or incurred by the
Purchaser due to any failure or interruption of equipment due to the need for repair or alteration
or breakdown but, the Seller will assist the Purchaser in minimizing any losses that the Purchaser
may incur.

5. Purchaser shall:

(i)       provide a deposit of $10,000 to the Southern Minerals Group, LLC bank
account  within one business day of signing of this Agreement, as advised. _PJB CH_

(ii)      Prior to commencement of this Agreement, but not greater than seven days from signing of this Agreement, the Purchaser shall provide the Seller with a standby letter of credit in the amount of $250,000.00 issued by a major US banking institution authorizing the seller to draw against it in the event Purchaser fails to timely pay any invoice in full or provide, in solicitor's trust, a deposit of $250,000 with instructions that this is to be released to SMG on the provision by SMG that there has been a default on payment under the Agreement.  This notification is to be given at SMG's sole discretion and the solicitor has to be irrevocably instructed to act on any such notice.

(iii)      make payment for all concentrates purchased on a monthly basis within ten days after being presented with an invoice from Seller.

6.  Purchaser acknowledges and is aware that local governmental regulations limit the total tonnage of concentrates that may be removed from the mine site to 11,000 tons per month, and that Seller's other existing commitments presently utilize up to approximately one-half of that amount, leaving only approximately 5,500 tons per month now available to Purchaser. Seller agrees to inform Purchaser if and when other purchasers fail to purchase their entire committed amount so as to allow Purchaser the opportunity to acquire a larger amount in any particular month.

7.  Seller warrants and covenants to and with Purchaser that it can provide good and marketable title to the subject concentrates, that they are by-products of lawful mining operations, have been properly severed from the realty from which they came, are free and clear of any liens or claims of any kind or nature, and will be free and clear of any liens or claims of any kind or nature when conveyed to Purchaser.

8.1 If a Force Majeure Event affecting a Party precludes that party ("Precluded Party") partially or wholly from complying with its Obligations (except its payment obligations) under this Agreement then:

(a) as soon as reasonably practicable after that Force Majeure Event arises, the Precluded Party must notify the other Party of

(i)      the Force Majeure Event;

(ii)      which obligations the Precluded Party is precluded from performing ("Affected Obligations");

(iii)      the extent to which the Force Majeure Event or its consequences preclude the Precluded Party from performing the Affected Obligations ("Precluded Extent"); and

(iv)      the expected duration of the delay arising directly out of the Force Majeure Event or in consequence of it;

(b)      the Affected Obligations will, to the Precluded Extent, be suspended for the duration of the actual delay arising directly out of the Force Majeure Event ("Actual Delay"); and

(c)      the other Party's Obligations which are dependent on the Affected Obligations will be suspended until the Precluded Party resumes performance.

8.2 The Precluded Party must, as soon as reasonably practicable after cessation of a Force Majeure Event, resume performance of the Affected Obligations and must use reasonable

endeavours in some form or manner, but need not be possible, but
"reasonable endeavours" does not require a Party to pay money in an attempt to overcome the
event or to settle any industrial dispute against its wishes.

9. To prevent possible confusion Seller and Purchaser agree that this Agreement is to be
applied in accordance with the laws of the State of New Mexico other than its conflicts of laws
principles.

10. Parties agree that any dispute or controversy arising out of or relating to this
agreement or the interpretation thereof, shall be settled by arbitration, held in a mutually
acceptable location to the parties, in accordance with the rules, then in effect, of the American
Arbitration Association.

11. Either Party may assign this agreement, upon written notice, provided such
assignment is to a commonly controlled affiliate.

12. Either Party may terminate this Agreement on a serious breach of Agreement after
giving 30 days notice ("Notice Period") to the other Party to rectify the breach and that breach is
not rectified within the Notice Period.  The termination of this Agreement shall not affect the
rights of the aggrieved party in seeking damages in relation to the Agreement being terminated.

13. Southern Mineral Group, and its affiliates agree not to use the name CV Investments
in any public media without Purchasers written permission *unless required by law.* BS CH

Seller and Purchaser have executed this Agreement effective as of the ⁷ day of
April, 2017.
CH ₦₀

Southern Minerals Group, LLC                      CV Investments LLC




By: *Clovis Hooper*                               By: *Brenda Smith*

Clovis Hooper,                                    Brenda Smith,

President                                         Managing Member

Southern Minerals Group LLC                       CV Investments LLC

1

**EXHIBIT 3**

## FIRST AMENDMENT TO
## MAGNETITE CONCENTRATES PURCHASE AND SALE AGREEMENT

This First Amendment ("Amendment") to Magnetite Concentrates Purchase and Sale Agreement is made as of this sixth day of June 2018, among **Southern Minerals Group, LLC,** P.O. Box 535 Silver City, **NM** 88062 **("Seller")** and **CV Investments, LLC** and affiliates, 200 Four Falls Corp. Ctr. Suite 211, Conshohocken, PA 19428.

WHEREAS, Seller and Purchaser are parties to that certain Magnetite Concentrates Purchase and Sale Agreement dated April 7, 2017 ("PSA"), providing for the sale of magnetite concentrates, a treated by-product of copper mining and milling operations conducted at a mine in Grant County, New Mexico; and

WHEREAS, Shipments of magnetite concentrates began on or around July 1, 2017 in accordance with the PSA; and

WHEREAS, the Purchaser has notified the Seller that it is unable to take delivery of the minimum volume of 4,000 tons per month required under Section 2 of the PSA due to delays in the Purchaser obtaining environmental approvals; and

WHEREAS, Seller and Purchaser desire to revise the Purchaser's volume obligation under the PSA as set forth in this Amendment.

NOW, THEREFORE, in consideration of the premises, mutual covenants and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Seller and Purchaser agree as follows:

1. Seller waives Purchaser's obligation under Section 2 of the SA to purchase a minimum of 4,000 tons a month for the period March 1, 2018 through May 31, 2018; provided, however, that such waiver is contingent on Purchaser meeting its obligations as otherwise required in the PSA and this Amendment.

2. Purchaser agrees to pay Seller the "Outstanding Amount" under the PSA of $521,404 as of March 31, 2018 in accordance with the following schedule:

| CVI Investments Outstanding Amount Payment Schedule | | |
|---|---|---|
| Monday , 20 April 2018 | $50,000 | Paid |
| Monday, 4 May 2018 | $50,000 | Paid |
| Monday, 18 May 2018 | $50,000 | Paid |
| Monday, 1 June 2018 | $50,000 | |
| Monday, 15 June 2018 | $50,000 | |
| Monday, 29 June 2018 | $50,000 | |
| Monday, 13 July 2018 | $50,000 | |
| Monday, 27 July 2018 | $50,000 | |
| Monday, 10 August 2018 | $50,000 | |
| Monday, 24 August 2018 | $71,404 | |
| | | |
| Total | $521,404 | |

3. Upon Purchaser's full payment of the Outstanding Amount, Purchaser shall be entitled to 2,717.89 tons for which Purchaser was invoiced in February 2018 and which Purchaser has not yet taken delivery. Purchaser's option to take 2,717.89 tons shall expire on November 30, 2018 and no refund shall issue if the material is not taken by that date.

4. Section 2 of the PSA is amended as follows :

   a. The last sentence of Section 2 is deleted in its entirety and replaced as follows:

      i. "The Purchaser undertakes to purchase a minimum of 4,000 tons per month from June 1, 2017 to February 28, 2018."

   b. The following new paragraphs are added to the end of Section 2:

      i. "Prepayment Period (June 1, 2018 - February 1, 2019): On June 15, 2018, September 1, 2018, and December 1,2018 Seller will invoice Purchaser in advance for 4,685.50 tons per quarter ("Prepaid Quantity") and the Purchaser will pay a non-refundable amount of $375,000 ("Prepayment") in relation to sales for that quarter (the Prepayment is in addition to the payments made in satisfaction of the Outstanding Amount under Section 2 of this Amendment) in accordance with the terms of the PSA. If Purchaser does not take the Prepaid Quantity within 12 months of the invoice date, Purchaser forgoes any right to take the remaining balance of the Prepaid Quantity for the applicable calendar quarter and Seller retains all prepayments made by Purchaser. If Purchaser ships

4,000 or more tons in any month during the Prepayment Period or there after then the "Outstanding Prepayment" which is the sum of all Prepayments made by Purchaser less the value of any material delivered, shall be reduced by a maximum of $125,000 in that month and the Purchaser will be deemed to have been delivered 1,562.50 tons of material."

ii. "Beginning on March 1, 2019, Purchaser shall resume its obligation to undertake to purchase a minimum of 4,000 tons per month at $80 per ton."

5. Section 1 of the PSA is amended as follows:

   a. The last sentence of Section 1 is deleted in its entirety and replaced as follows:

      i. "Should, for any reason, Seller's right to access this material is terminated, then on the day that access to the material is terminated this Agreement will terminate without further recourse to Purchaser and Seller. Upon termination, Seller has no obligation to refund any Outstanding Prepayment Amount, nor provide any additional material, nor provide material that the Purchaser has paid for but has not yet been delivered."

The Seller and the Purchaser have executed this First Amendment to the Magnetite Concentrates Purchase and Sale Agreement effective as of the sixth day of June, 2018.

Southern Minerals Group LLC          CV Investments LLC


Clovis Hooper                        Brenda Smith
President Southern Minerals          Managing Member CV Investments
Group LLC                            LLC